IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| Jonathan Barger, | : | Case No. 1:17-cv-77 |
| --- | --- | --- |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | |
| United Brotherhood of Carpenters and Joiners of America, *et al.*, | : | Order Granting Defendants' Motions for Summary Judgment |
| | : | |
| Defendants. | : | |

This matter is before the Court on motions for summary judgment filed by Indiana/Kentucky/Ohio Regional Council of Carpenters ("IKORCC") (Doc. 111), Local Union 2, United Brotherhood of Carpenters and Joiners of America ("Local 2") (Doc. 112), United Brotherhood of Carpenters and Joiners of America ("UBC") (Doc. 113), and Dynegy Inc. ("Dynegy") (Doc. 104). For the reasons that follow, Defendants' Motions will be **GRANTED.**

I. Facts[1]

A. Barger's Union and Work History

Plaintiff Jonathan Barger has been a member of Defendant Local 2 since 1999. Local 2 is a local labor organization headquartered in Monroe, Ohio representing individuals employed in the carpentry and related industries in Southwest Ohio. Local 2 is an affiliated local union of the IKORCC, which itself is an affiliated regional council of the UBC. The IKORCC is a regional labor organization which represents individuals employed in the carpentry and related

---

[1] The Court has drawn its facts from the proposed statement of undisputed facts submitted by each Defendant to the extent they are admitted by Plaintiff in his respective responses. The Court will only cite to the record for the source of any disputed or particularly pertinent undisputed fact. *See* Dynegy's Proposed Statement of Undisputed Facts, Doc. 104-1 and Plaintiff's Response at Doc. 125-1; IKORCC's Proposed Statement of Undisputed Facts, Doc. 111-1 and Plaintiff's Response at Doc. 124-1; Local 2's Proposed Statement of Undisputed Facts, Doc. 112-1 and Plaintiff's Response at Doc. 127-1; UBC's Proposed Statement of Undisputed Facts, Doc. 113-1 and Plaintiff's Response at 126-1.

industries in Indiana, Kentucky, and Ohio, whereas the UBC is an international labor organization representing employees working in the carpentry and related trades in the United States and Canada.

Plaintiff began working as a carpenter for Solid Platforms Industries[2] ("SPI") in approximately 2007 or 2008. SPI, a construction company, is a signatory of the IKORCC's Carpenters Agreement (the "Southwest Ohio CBA"). SPI performs scaffolding work and some installation for its customer, Dynegy, Inc., a company which owned and operated the Zimmer Power Station ("Zimmer Station") in Moscow, Ohio.[3] Zimmer Station is an independent power producer that sells its energy and capacity into a regional transmission organization.[4]

Plaintiff worked intermittently for SPI with periods of layoffs and employment between 2007 and 2015. While employed at SPI, Plaintiff worked at multiple job sites, including at Zimmer Station between 2014 and 2015. While working at Zimmer Station, Plaintiff reported to three SPI supervisors: General Foreman Art Galea, Project Manager Kipp Kahlenbeck, and Safety Manager/Area Manager Daniel Jason Hall. On October 25, 2015, SPI laid off Plaintiff along with some other employees who were working at Dynegy's Zimmer Station.

On October 27, 2015, Barger called Joe Lind, Dynegy's Maintenance Manager at Zimmer Station who is responsible for certain outside vendors, including SPI. During that call, Barger asked Lind for a job with Dynegy, and Lind responded that they were not taking applications. (Barger Dep., Doc. 97 at PageID 912.) Barger responded that if he could pay his own way, he would like to have a job, and Lind asked, "How's that?" (*Id*.) Barger told Lind that

---

[2] SPI, originally named as a defendant, was dismissed as a party to this action. (Doc. 72.)
[3] Dynegy is now known as Vistra Energy Corp. but for purposes of this action, the Court will continue to refer to it as Dynegy.
[4] It is not a public utility.

"Solid Platforms are stealing money from you," by which he meant falsifying hours. (*Id*. at 912–13.) Barger brought up his allegation of hours falsification as a way to save Dynegy enough money to pay for his employment. (*Id*. at 913.)

Shortly after the phone call with Barger, Lind decided to ban Plaintiff from Zimmer Station, although Barger was not told this at the time. On October 28, 2015, Lind instructed the maintenance facility supervisor to place Plaintiff on Zimmer Station's banned from site list. Lind attests that he did not ban Barger from the site because he reported alleged overbilling by SPI. (Lind Decl., Doc. 103-1 at PageID 1837.)

The same day that Barger initially spoke to Lind, October 27, 2015, Barger also called Dave Meier, an IKORCC business agent and member of Local 2. Barger told Meier that he had not received his paycheck, and Meier responded that he would look into it. Barger also told Meier that he spoke to Lind and told him that Kahlenbeck, Hall, and Galea were "ghost payrolling" at Dynegy. That same day, Meier called Galea to ask about Barger's paycheck.

Meier testified that after their initial call, he and Barger spoke every day until October 30, 2015 when Meier notified Barger his final paycheck from SPI was in the mail. Two notable conversations occurred during this timeframe. Meier initiated a call with Barger with senior service representative, Jeff Gressler, listening on the line. (Meier Dep., Doc. 101 at PageID 1722.) Meier asked Gressler to listen in on the call because he was contemplating filing a charge against Barger and wanted a witness. (*Id*. at 1723–24.) With Gressler listening on the line, Meier called Barger and asked if it was true he went to Lind. (*Id*.) Barger confirmed doing so, and Meier asked him "if he was aware of potential consequences to brother and sister members." (*Id*. at 1722–23.) According to Meier, Barger said he was aware of any consequences that could

3

have occurred, but it would be worth it to get even with Galea, Kahlenbeck, and Hall because "he was sick of their shit." (*Id*. at 1723.)

During another conversation, Barger called Meier to ask about his paycheck. He referenced the three union members he believed were ghost payrolling and stated that "if that's the kind of guys that you want in your union then, you know, I don't want to be a part of it," and stated that he would be taking a nonunion job. (*Id*. at 1726.)

### B. Meier's Charge Against Barger and Barger's Subsequent Grievances

On October 30, 2015, Meier filed a charge with the IKORCC against Barger for violation of Section 51(A)(1) and 51(A)(12) of the UBC Constitution. (Barger Dep, Ex. 30, Doc. 97-30 at PageID 1317–18.) In his description of the Charge, Meier stated:

> On October 25, 2015 John Barger went to Joe Lind a representative for Dynegy at the Zimmer Power Plant with the full intensions of slandering Art Galea, Jason Hall, and Kipp Kahnenbeck ( all members ) as well as Solid Platforms with the hope of having all of them removed from all Dynegy Plant. On October 29, 2015 John stated that he was well aware of the repercussions that could occur to all Brothers and Sisters members working in Dynegy Plants, "but to get them three it would be worth it, I am sick of their shit".
>
> On October 30, 2015 John called me again to tell me that he would be going to work non-union for Sunbelt and that they would be replacing Solid Platforms at the Zimmer Power Plant by December. Sunbelt asked John about his union ties and John said that "he was done with the union"
>
> I David Meier am charging Jonathan Barger with Causing Dissension section 5 (A) (1) and violating the Obligation of the U.B.C. section 51 (A) (12) ( that I will use every honorable means to procure employment for Brother and Sister Members ) (I pledge myself to be respectful in words and action and charitable in judgement of Brother and Sister members )[5]

---

[5] Various typographical errors copied as written.

(*Id*. at 1318.)  According to Meier, it was not Barger's statements to Lind that caused him to file the charges, but the fact that Barger "wouldn't let it go" and continued to "attack" the three union members.  (Meier Dep., Doc. 101 at PageID 1773–74.)

The IKORCC trial committee held a trial on May 11, 2016 and recommended a verdict of upholding the charge and fining Barger $5,000.  The delegates of the IKORCC adopted the trial committee's recommendation following Barger's addressing the trial committee's report and recommendation at an IKORCC delegates meeting.  The UBC was not involved in processing the disciplinary charges at the affiliate level.

Barger filed a grievance on May 11, 2016, but the UBC rejected it on May 16, 2016 as being untimely and outside of the thirty-day window from the date the grievance occurred. (Doc. 97-33.)  Barger filed another grievance dated May 11, 2016 alleging that he was improperly not being referred out to work by Meier.  The UBC investigated the allegation and denied the grievance as being without merit.

On August 8, 2016, Barger filed a grievance with the UBC regarding IKORCC's failure to provide a receipt for his appeal payment.  (Doc. 97-23.)  He requested that the UBC cease all actions and immediately deliver a copy of the trial proceedings and a receipt for the deposit on his account.  He also requested that the time to prepare for his appeal be extended.  On August 11, 2016, the UBC denied the grievance, as a receipt had been issued at that point, an appeal was premature as the penalty was stayed.  The UBC found no merit to Barger's request to extend his appeal time.  (Doc. 97-24.)

On August 22, 2016, Barger attempted to file an appeal of the IKORCC trial committee's decision to the UBC, but on September 8, 2016, the UBC rejected the appeal for review at that time as being incomplete for failure to include a receipt.  (Doc. 97-26 at PageID 1289.)  The

UBC directed Barger to submit the receipt as soon as possible and deliver a copy of his appeal; once complete, the IKORCC would be notified and given the opportunity to submit an answer. (*Id.*)

By letter of September 22, 2016 (but erroneously dated August 22, 2016), Barger perfected his appeal to the appeals committee. (Doc. 97-27.) On October 4, 2016, the UBC considered Barger's appeal filed and requested the IKORCC to file an answer. (Doc. 97-30 at PageID 1302.) On November 17, 2016, Barger filed an additional grievance regarding the IKORCC's failure to file a timely response to his appeal. (Doc. 118-1 at PageID 2112.) On November 21, 2016, the IKORCC filed with the UBC its answer to Barger's appeal. (Doc. 97-30.)

On May 16, 2017, the UBC granted Barger's appeal and ordered his $50 appeal fee be returned to him. (Doc. 97-29.) The $5,000 fine levied against Barger was never enforced, as the UBC Constitution provides that any disciplinary action be stayed pending final resolution of the charge.

### C. Barger Performs Work as an Independent Contractor for ESS

On November 12, 2015, Plaintiff signed an Independent Contractor Agreement with Environmental and Safety Solutions, Inc. ("ESS"), a company that provides safety supervision services as a contractor on construction sites. The Independent Contractor Agreement states:

> The Contractor[6] is and shall, at all times during the term of this Agreement, remain an independent contractor to the Company.[7] At no time shall the Contractor be considered to be an employee of the Company, agent of the Company, or anything other than an independent contractor.

---

[6] "Contractor" is defined as Jonathan Barger.
[7] "Company" is defined as ESS.

(Doc. 97-2 at PageID 1099.)  At his deposition, Plaintiff confirmed that he "was an independent contractor" for ESS.  (Doc. 97 at PageID 952.)  Plaintiff reported his payments from ESS on an IRS Form 1099.

ESS assigned Plaintiff to work at the Zimmer Station on the Saturday before Thanksgiving in 2015 to perform safety services for C&K.  When he arrived on site, the guard on site refused to let Plaintiff enter.  Prior to being denied entry, Plaintiff did not tell anyone at Dynegy that he would be working for ESS.  (*Id*. at PageID 946–47.)

After being denied entry to Zimmer Station, ESS assigned Plaintiff to work at a site in Indiana for C&K beginning the Monday before Thanksgiving 2015.  On the Wednesday before Thanksgiving 2015, Plaintiff performed safety services for ESS at multiple sites.

After the work that Plaintiff performed for ESS on the Wednesday before Thanksgiving 2015, Plaintiff received no additional assignments from ESS.  No one at ESS told Plaintiff that his independent contractor relationship with ESS was terminated.  (Barger Dep., Doc. 97 at PageID 952.)  Plaintiff does not know why he stopped receiving assignments from ESS.  (*Id*. at PageID 964–65.)  Aside from a text message that Plaintiff sent in April 2017 to Elaine Harris, a representative of ESS, Plaintiff does not recall whether he requested more work assignments from ESS following his last day worked for ESS on the Wednesday before Thanksgiving 2015.

Plaintiff has since worked multiple jobs for multiple employers beginning with Perkins/Carmack Construction in January 2016, a job that Plaintiff ultimately quit.

### D.  Mix 20/20 Job Referral System

The IKORCC provides a non-exclusive referral service for carpenters and other represented members of the IKORCC called the "Mix 20/20" job referral system.  This is an automated system whereby a member submits his skill sheet to be input into the Mix 20/20

system identifying his or her skills, types of jobs the member will accept, and member's contact information. IKORCC signatory contractors call in their job dispatch requests, which are input into the Mix 20/20 system for matching on the list. The computer then calls the member offering the referral, continuing down the referral list until it is accepted. If the individual does not answer the call, the call goes to voicemail and the individual may call back and inquire about the job and accept it if it is still open. Individuals must re-sign the list every thirty days or their name is dropped from the contact list.

Barger knows how the automated referral service works but did not place himself on the out-of-work list between his layoff in October 2015 and January 2016. Between January 2016 when Barger first placed his name on the list and January 2018, he was called by the Mix 20/20 system 195 times for job referrals.[8] At the time of his deposition, Barger was working at a job to which he was referred through the IKORCC referral system in January 2018, where he continues to work.[9]

Barger does not know of any instances where the union failed to offer him available work. He alleges he lost sleep and worried about whether he was going to lose his house, but he saw no psychiatrists, mental health providers, or licensed social workers.

### E. Procedural History

Plaintiff initiated this action on February 3, 2017. (Doc. 1.) On March 30, 2018, the Court granted in part and denied in part motions to dismiss filed by UBC, IKORCC, Local 2, and

---

[8] He let the call go to voicemail 109 times, one call failed to connect to Barger's telephone, on eight occasions there was no answer, he answered and declared himself unavailable 20 times, declined 31 possible job referrals, and accepted four referrals.

[9] In addition, The Ohio Department of Jobs and Family Services awarded Barger a total of $22,186 in unemployment benefits in 2016–2017.

Dynegy and granted a motion to dismiss filed by Solid Platforms, who was then a Defendant.[10]

(Doc. 72.) The following claims remain:

(1) Violation of Barger's right to free speech under Section 101(a)(2) of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(2) by Local 2, UBC, and IKORCC;
(2) Conspiracy to retaliate against Barger for the exercise of his free speech rights in violation of the LMRDA by UBC and IKORCC; and
(3) Tortious interference with Barger's employment relationship with ESS by Dynegy.

On March 25, 2019, all four remaining Defendants filed motions for summary judgment (Docs. 104, 111, 112, 113). For the reasons that follow, Defendants' motions will be **GRANTED**.

## II. Legal Standard

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of showing that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 585–87; *Provenzano*, 663 F.3d at 811.

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go

---

[10] The Court also dismissed former Plaintiff Charlotte Nealan from this action. (Doc. 72.)

beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III. Analysis

### A. LMRDA Violation

Barger alleges that the internal disciplinary charges brought against him by Meier were based on speech protected by the LMRDA. IKORCC, Local 2, and UBC all move to dismiss Barger's LMRDA claim on the basis that Barger's speech is not protected by the LMRDA.[11] IKORCC and Local 2 also argue that there is no evidence of damages.

#### 1. Barger's Speech is Not Protected by the LMRDA

At the motion to dismiss stage, the Court found that Barger's alleged reporting of hours falsification resulting in a grievance being filed against him supported the inference that his speech went beyond a one-off grievance about an idiosyncratic issue but concerned corruption by union members reporting their hours. The Court found that discovery would reveal more about the content, form, and context of Barger's speech, so as to determine whether the speech is a matter of union concern protected by the LMRDA. Now that the record is more fully developed, the Court finds that Plaintiff's claim fails as a matter of law.

---

[11] As alternative basis for dismissal, UBC argues that there is no evidence of agency or ratification.

Section 101(a)(2) guarantees "Freedom of speech and assembly," as follows:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; <u>and to express any views, arguments, or opinions</u>; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2) (emphasis added). To prevail on an LMRDA retaliation claim, Plaintiff must prove: "(1) his conduct constituted 'free speech' under the LMRDA; (2) that the speech was a cause for the Union taking action against him; and (3) damages." *Leavey v. Int'l Bhd. of Teamsters--Theatrical Teamsters Local Union No. 817*, No. 13-CV-0705 (NSR), 2015 WL 5802901, at *8 (S.D.N.Y. Oct. 5, 2015) (citing *Commer v. McEntee,* No. 00–cv–7913 RWS, 2006 WL 3262494, at *10 (S.D.N.Y. Nov. 9, 2006) (citations omitted)).

The Sixth Circuit has not addressed the application of the LMRDA to facts similar to those present here, but has recognized that the legislative history of Title I of the LMRDA compels a "broad reading" and grants courts latitude in fashioning relief to open channels of communication between members and promote the development of union democracy. *Knox County Local, Nat. Rural Letter Carriers' Assoc. v. Nat'l Rural Letter Carriers' Ass'n*, 720 F.2d 936, 939 (6th Cir. 1984). Some circuits have held that "'the threshold inquiry in the LMRDA context is whether the speech at issue may be fairly characterized as a matter of *union concern*'—that is, whether the speech 'relates to the general interests of the union membership at large.'" *Trail v. Local 2850 UAW United Def. Workers of Am.,* 710 F.3d 541, 546 (4th Cir. 2013) (citing *Hylla v. Transp. Comm. Int'l Union,* 536 F.3d 911, 917 (8th Cir. 2008) (internal quotation

marks omitted)). In analyzing whether speech is a matter of union concern, these courts have considered the content, form, and context of the speech at issue. *Id*.

Defendants argue that the Court should look to the Sixth Circuit's decision in *Bonnell v. Lorenzo*, 241 F.3d 800, 809–10 (6th Cir. 2001) as a guide in our Circuit and confirmation that whether speech is a matter of "union concern" is a threshold question for LMRDA free speech claims. There, the Court held that if plaintiff's speech does not involve a matter of public concern, it is unnecessary for the Court to scrutinize the reason for the discipline. Extending that logic to the LMRDA, the threshold inquiry should therefore be whether Plaintiff's speech touched on a matter of union concern. The Court finds these authorities compelling and will consider as a threshold question whether Plaintiff's speech touched on a matter of union concern.

The authorities relied upon by Defendants distinguish between matters of "idiosyncratic" and "union" concern, but the most on point Circuit Court decision is that of *Kazolias v. IBEWLU 363,* 806 F.3d 45, 51 (2d Cir. 2015).[12] In *Kazolias*, plaintiffs asserted that they were improperly denied job referrals by the union in retaliation for filing grievances with the union and complaints with the NLRB, EEOC, and federal court. *Id*. The Second Circuit Court of Appeals found the plaintiffs failed to state a viable claim under the LMRDA. *Id*. at 52. The Court was guided by the following principles:

> The more the speech relates to matters of significant interest to the membership as a whole, and the more it seeks to influence union policies or actions with respect to such issues, the more such speech is likely to come within the scope of Title I. In contrast, the more speech is limited to asserting a personal grievance of the

---

[12] The Court notes that the district court case of *Wiszynski v. United Food and Comm. Workers, Loc. 400*, No. GJH-17-3163, 2018 WL 4206952, at *1 (D. Md., Sept. 4, 2018) also supports Defendants' position. In *Wiszynski*, the district court dismissed an LMRDA free speech claim where the plaintiff relayed concerns about the local union's legal bills to the local union's chief of staff but did not go so far as to say that a breach of fiduciary duty had occurred. *Id*. at *5–6. The court considered that the plaintiff did not raise her concern with any members beyond the chief of staff, nor was the issue raised during a union meeting. *Id*. at *6.

> plaintiff and the more it seeks merely personal relief for the plaintiff, as opposed to advocacy for changes that would affect the membership as a whole, the less likely that the particular speech comes within the scope of protection of Title I.

*Id*. The Court reasoned that although the subject of a union's hiring hall was of vital interest to full membership and in certain circumstances would be protected from retaliation under Title I, not every personal grievance premised on an allegation of an inappropriate job referral necessarily qualifies as protected speech. *Id*. The Court found that the plaintiffs' making complaints to the NLRB and EEOC provided the context that the plaintiffs sought only personal redress and did not make an attempt to publicize their grievances among union membership in an effort to change union policies. *Id*. "They sought only individualized personal relief. There is no indication in the record that an offer of personal compensation would not have been sufficient to satisfy Plaintiffs entirely, without any effect on union practices." *Id*.

Plaintiff argues that his speech is protected, because under authority from the Second Circuit, a union may not "validly discipline a member upon charges and a record which include accusations against union officers as an essential element." *Petramale v. Local No. 17 of Laborers Int'l Union*, 736 F. 2d 13, 18 (2nd Cir. 1984) (finding speech critical of union official to be protected under the LMRDA). Plaintiff contends that charges for slander were brought by Meier, a business manager of the IKORCC, because Barger went to Lind with the full intentions of slandering Galea with accusations of time theft. At the time the charges were filed, Galea was Vice President of Local 2. (Galea Dep., Doc. 98 at PageID 1388.) Plaintiff argues that the IKORCC disciplined him for, put him on trial, and convicted him for alleged slander of Vice-President Galea.

Defendants respond that this case is both procedurally and factually distinguishable. *Petramale* was a 28 U.S.C. § 529 retaliation case, and it involved a union member who was

denied his chance to speak at a contentious union meeting and thereafter was involved in a scuffle, which ended in the member yelling profane and slanderous remarks about the union officials and being escorted out of the meeting. *Id*. at 15, 18. Thus, the speech in *Petramale* would meet the "of union concern" test, because the speech was made in the context of a union meeting in front of other union members. Plaintiff also relies upon *Hatchigian v. Int'l Broth. Of Elec. Workers*, *Local Union No. 98*, No. 87-7131, 1990 WL 2795, at *1 (E.D. Penn. Jan. 17, 1990), *granting reconsideration in part*, 1990 WL 35726 (E.D. Penn. Mar. 26, 1990), which Defendants argue is factually distinguishable and unpersuasive due to its procedural history. In *Hatchigian,* plaintiff alleged that his union unlawfully punished him in retaliation for exercising his free speech rights where he was disciplined after playing a tape recording at a union job site of a conversation between a union officer and union member of a dispute over the wage rate paid at another job site. The court concluded that plaintiff's discipline was unlawful as a matter of law and he was entitled to summary judgment on his retaliation claim. However, the decision was revised two months later. *Hatchigian* was originally a § 529 discipline case and the decision was superseded by the Supreme Court decision, *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67 (1989), which held that a union's refusal to refer a member through its hiring hall did not constitute discipline under § 529. The second *Hatchigian* decision allowed Plaintiff to amend his complaint to assert an independent violation of the Plaintiff's free speech rights under the LMRDA. This case's odd procedural history and subsequent persuasive Circuit Court decisions to the contrary, as discussed above, renders this case less persuasive to the Court.

The Court finds that Barger's speech does not implicate matters of union concern in consideration of the form, content, and context of the speech as revealed by the record as a

14

whole. Barger's speech is akin to that at issue in *Kazolias* because the speech seeks personal relief for the plaintiff as opposed to advocacy for changes that would affect the union membership as a whole. Although the content of Barger's speech weighs in favor of finding it to be a matter of union concern, the form and context do not. Barger admittedly raised his concern to Lind (a third party) out of self-interest during a private phone call. His motivation was to obtain a job, and he admits he reported the alleged ghost payrolling to help cover the cost of his employment. Barger also reported the alleged ghost payrolling to at most two union members, Meier and possibly Kahlenbeck. Barger reported the allegation to Meier allegedly out of spite to get back at the three union members involved because he was "sick of their shit." (Meier Dep., Doc. 101 at PageID 1723.) Barger also believes he may have informed Kahlenbeck of his allegation two years prior to his subsequent report, in 2013, but did not use the intervening time to convey his concerns to any other union members or otherwise pursue the issue. (Barger Dep., Doc. 97 at PageID 929.) When asked in his deposition to identify other union members to whom he identified his concerns about fraudulent misbilling, Plaintiff answered that he "probably [had] talked to some of our union members" but he "can't say of anybody in particular." (*Id.* at PageID 1044.)

This is not a case where Plaintiff was actively broadcasting his concerns to his fellow union members to remedy union corruption. To the extent his complaint was initially raised years prior, he acted with no urgency in the intervening time until it was in his interest to raise the issue again to try to seek employment. The form and context of Barger's complaint stands in stark contrast to individuals who raise complaints of corruption at a union meeting or seek to publicize such information. In contrast, telling one or possibly two union members, with a large gap in time between the two reports, is not compelling evidence that Barger's speech was in the

15

context of furthering union democracy. Because Plaintiff's speech fails the threshold inquiry of being a matter of "union concern," the Court finds that his LMRDA claim fails as a matter of law.

### B. Conspiracy to Violate the LMRDA

IKORCC and UBC argue that if there is no LMRDA violation, the conspiracy claim also fails, and the Court agrees.[13] "To prevail on a claim of civil conspiracy, the plaintiff must establish: (1) a malicious combination; (2) involving two or more persons; (3) injury to persons or property; and (4) the existence of an unlawful act independent from the actual conspiracy." *Ruff v. Bakery, Confectionery, Tobacco Workers & Grain Millers & Indus. Int'l*, No. 2:14-CV-593, 2015 WL 586112, at *3 (S.D. Ohio Feb. 11, 2015) (citing *Lemaster v. Anchor Hocking LLC,* No. 2:11–CV–549, 2012 WL 3224094, at *4 (S.D. Ohio Aug. 6, 2012) (internal quotation marks omitted)). "A conspiracy cannot be made the subject of a civil action, however, unless there is an underlying unlawful act." *Blessing v. United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Service Workers Int'l. Union*, 244 Fed. App'x 614, 622–23 (6th Cir. 2007). Because the Court has found no LMRDA claim, the conspiracy claim necessarily fails.

### C. Tortious Interference

Defendant Dynegy argues that it is entitled to summary judgment on Plaintiff's tortious interference with employment relationship claim. In order to establish a tortious interference with an employment relationship claim, a plaintiff must prove: (1) the existence of an employment relationship between plaintiff and the employer; (2) the defendant was aware of the

---

[13] Finding this dispositive, the Court will not evaluate the other arguments raised regarding the conspiracy claim.

relationship; (3) the defendant intentionally interfered with this relationship; and (4) the plaintiff was injured as a proximate result of the defendant's acts. *Slyman v. Shipman, Dixon & Livingston, Co., L.P.A.*, No. 2008-CA-35, 2009 WL 2489333, at *2 (Ohio App. Aug. 14, 2009) (citing *Lennon v. Cuyahoga Cty. Juvenile Court*, No. 86651, 2006 WL 1428920, at *5 (Ohio App. 2006)). To succeed on a claim for interference with an employment relationship, as in this case, the plaintiff must also establish "wanton or malicious behavior." *Peters v. Monroe Tp. Bd. of Tr.*, No. 2:11-cv-00083, 2011 WL 3652719, at *5 (S.D. Ohio Aug. 18, 2011) (citing *Dryden v. Cincinnati Bell Tel. Co.*, 135 Ohio App. 3d 394, 400, 734 N.E.2d 409 (1999)). Furthermore, the right of noninterference in an employment relationship is limited, such that the tort only extends to "outsiders" to the employment relationship who maliciously interfere. *Id.*

Dynegy argues that Plaintiff is unable to meet any of the required elements of tortious interference, but the Court need not go further than the first element, which is dispositive. According to Dynegy, Barger had no employment relationship with ESS, because he was admittedly an independent contractor. During his deposition, Plaintiff testified as follows:

Q: Ok. But specifically though no one at ESS told you you're terminated, anything like that?

A: *I was an independent contractor.* They didn't have to say anything.

(Barger Dep., Doc. 97 at PageID 952) (emphasis added). It is undisputed that Plaintiff signed an Independent Contractor Agreement with ESS stating that he "is and shall, at all times during the term of this Agreement, remain an independent contractor to the Company. At no time shall the Contractor be considered to be an employee of the Company, agent of the Company, or anything other than an independent contractor." (Doc. 97-2.) And, Plaintiff claimed his income from ESS on IRS Form 1099, which is not applicable to employees. (Doc. 97-4.)

Despite these uncontroverted facts, Plaintiff attests in an affidavit submitted in response to Dynegy's Motion for Summary Judgment that, "I believe that I was employed by, and in an employment relationship with, ESS." (Doc. 123 at PageID 2145.) He elaborates: "During my employment with ESS, I did not choose my work hours. I performed my job and tasks at the direction of ESS. I did not supply my own tools and did not have any significant investment in the company. My employment with ESS was expected to be long-term." (*Id*. at 2144–45.) He alternatively argues that Ohio law supports the conclusion that an independent contractor relationship can constitute a form of an employment relationship.

The Court finds Plaintiff's last-ditch arguments inconsistent with both Ohio law and common sense. The Court will not consider Plaintiff's affidavit testimony in his affidavit that is plainly contradictory to his prior testimony that he was an independent contractor for ESS. Plaintiff's affidavit also contradicts his deposition testimony that no one had to say that he was terminated from ESS because he was an independent contractor, and his assignments simply "stopped coming." (Doc. 97 at PageID 952.) He also testified that he did not know why he stopped receiving assignments from ESS. (*Id*. at 964–65.) It is black-letter law that a Plaintiff may not create a new issue of fact by filing an affidavit after a motion for summary judgment has been filed contradicting his earlier deposition testimony. *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986). The Court will not consider this evidence now to create a belated issue of fact over Barger's employment status.

Plaintiff alternatively argues that Ohio law does not distinguish between an independent contractor and employee for purposes of tortious interference with an employment relationship, and an independent contractor is a form of employment relationship. None of the cases upon which Plaintiff relies for this proposition are applicable. *Definitive Solutions Co. v. Sliper*, 60

18

N.E.3d 461, 465 (Ohio App. 2016) does not address the tortious interference with employment relationship tort but merely states that a noncompete may extend beyond individuals who perform work as direct employees to include independent contractors, thus reinforcing the difference between the two. Notably, the court separately analyzed a tortious interference with an employment relationship claim, which included consideration of whether a third party interfered with the employment relationship of the *employee* defendants. *Id*. at 465–66.

*Jackson v. Hogeback*, No. CA2013-10-187, 2014 WL 2742945, at *7, n.5 (Ohio App. June 16, 2014), upon which Plaintiff relies for the proposition that an independent contractor relationship qualifies as an "employment relationship," also does not address applicability to tortious interference claims. Rather, the case addresses the applicability of liability for assault, battery, negligence, vicarious liability, and negligent hiring, supervision, and retention of an alleged independent contractor. *Id*. at *1. In *dicta*, the Court noted that it assumed that the contractor was an employee for purposes of its analysis. It stated that for purposes of the negligent hiring and retention claims, "it is irrelevant if the worker is classified as an employee or an independent contractor as some sort of employment relationship existed, regardless of its type." *Id*. at *7, n.5. The Court does not find this helpful to its analysis on the question of a tortious interference with employment relationship claim.

Finally, Plaintiff relies upon *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984) and *Ellington v. City of East Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012) for the proposition that the line between employees and independent contractors can be murky. Neither of these cases go so far as to define an "employee relationship" to include an independent contractor in the context of tortious interference with employment relationship claims under Ohio law.

19

Although the Court was unable to find any case directly holding as much, the Court finds that the definition of "employment relationship" should be taken at face value. Ohio law distinguishes between employees and independent contractors, and "employment relationship" connotes a relationship over an *employee*, not a *contractor*. An independent contractor relationship is more aptly covered by the separate tort of tortious interference with a business or *contract* relationship. *See William Powell Co. v. Nat'l Indemnity Co.*, 141 F. Supp. 3d 773, 784 (S.D. Ohio 2015) (identifying the elements of tortious interference with *contract* claim as: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) lack of justification; and (5) resulting damages.) Plaintiff was admittedly an independent contractor. An "employment relationship" in a tortious interference with employment relationship claim under Ohio law does not include independent contractors where the separate tort of tortious interference with contract is available. As such, Defendant Dynegy is entitled to summary judgment on this claim.

## IV. CONCLUSION

For the reasons discussed herein, the motions for summary judgment filed by Indiana/Kentucky/Ohio Regional Council of Carpenters ("IKORCC") (Doc. 111), Local Union 2, United Brotherhood of Carpenters and Joiners of America ("Local 2") (Doc. 112), United Brotherhood of Carpenters and Joiners of America ("UBC") (Doc. 113), and Dynegy Inc. ("Dynegy") (Doc. 104) are **GRANTED**.

**IT IS SO ORDERED**.

                                                  S/Susan J. Dlott_____
                                                  Judge Susan J. Dlott
                                                  United States District Court